# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| Sharon Walker, | ) |
|                 Plaintiff, | ) Civil Action No.: 3:17-cv-01586-JMC |
| v. | ) **ORDER AND OPINION** |
| DDR Corp., BRE DDR Harbison Court LLC, Joe Doe No. 1, John Doe No. 2, John Doe Company No. 1, Joe Doe Company No. 2, Joe Doe Company No. 3, | ) |
|                 Defendants. | ) |
| BRE DDR Harbison Court LLC, | ) |
|                 Third-Party Plaintiff, | ) |
| v. | ) |
| Coffelt Consolidated Holdings Inc., *d/b/a* Elite Sweeping Service, | ) |
|                 Third-Party Defendant. | ) |

This matter is before the court for review of Plaintiff Sharon Walker's ("Plaintiff") Motion to Reconsider filed on February 18, 2019. (ECF No. 120.) Plaintiff requests the court to reconsider its Order and Opinion (ECF No. 103), filed on January 4, 2019, excluding her expert, Dr. Bryan Durig ("Dr. Durig"), from testifying at trial. (*Id.* at 8.) The court heard arguments regarding Plaintiff's Motion on February 21, 2019. (ECF No. 123.) On March 4, 2019, DDR Corp. and BRE DDR Harbison Court LLC (collectively, "Defendants") responded in opposition to Plaintiff's Motion. (ECF No. 125.) After careful consideration of Plaintiff's Motion and for the reasons set forth below, the court **DENIES** Plaintiff's Motion to Reconsider (ECF No. 120).

# I. FACTUAL AND PROCEDURAL BACKGROUND

On June 19, 2014, Plaintiff used a parking lot, owned, maintained, and managed by Defendants, in Columbia, South Carolina. (ECF No. 1-2 at 4 ¶ 10.) While using the parking lot, Plaintiff, allegedly, stepped into a hole between a water meter lid and the parking lot's surface. (*Id.*) Plaintiff maintains that she "fell violently to the ground and sustained serious injuries to her right knee." (*Id.* at 4 ¶ 11.) The parking lot was repaved after Plaintiff's accident, but before she filed the instant lawsuit. (ECF Nos. 43, 55.) After filing her Complaint in the Richland County Court of Common Pleas on May 9, 2017, Defendants removed the case to the United States District Court for the District of South Carolina on June 16, 2017. (ECF Nos. 1, 1-1.) Plaintiff's action is brought pursuant to the laws of negligence in South Carolina. (ECF No. 1-1.)

Prior to the court's Order and Opinion, Dr. Durig was prepared to testify as follows: (1) "[t]he sloped asphalt and the change in elevation in the area of the water valve cover is considered a hazardous area and *would be in violation of the requirements of ASTM F1637*"; (2) "[t]he sloped asphalt and the change in elevation in the area of the water valve *is in violation of the requirements of the IPMC*"; and (3) "it is concluded, to a reasonable degree of engineering certainty, *the sloped asphalt and the change in elevation in the area of the subject water valve cover is considered a fall hazard and is not being maintained in compliance with codes and industry standards.*" (ECF No. 55-2 at 5 (emphasis added).) Defendants moved to exclude Dr. Durig on July 20, 2018. (ECF No. 43.) The court heard arguments from the parties on December 5, 2018. (ECF No. 90.)

On January 4, 2019, the court filed its Order and Opinion, which excluded Dr. Durig from testifying because Plaintiff failed to "carry[] her burden under *Daubert*" and "establish[] the admissibility of Dr. Durig's testimony by a preponderance of proof." (ECF No. 96 at 21–22.) Specifically, the court held that "Dr. Durig's approach is insufficiently reliable" because he failed

to conduct "any measurements or testing of the water valve's photograph, despite having the means to do so." (*Id.* at 20.) The court further reasoned, applying *Daubert*, that Plaintiff did not show "Dr. Durig's method of measuring . . . is generally accepted in the scientific community or subject to peer review," failed to provide the potential rate of error of Dr. Durig's methodology, and neglected to supply "any other factors under which to evaluate Dr. Durig's opinion." (*Id.*) Because of Dr. Durig's peculiar practice by way of measuring only through his observations, the court found it "impossible . . . to determine whether Dr. Durig reliably applied his methodology to the water valve cover, which in turn impact[ed] his subsequent opinions regarding the [applicable] industry standards." (*Id.*) As to the industry standards, the court found that the International Property Maintenance Code ("IPMC") and the American Society for Testing and Materials ("ASTM") depend upon explicit measurements, and Dr. Durig's lack of physical measurements made it "impossible for him to reliably determine whether Defendants were in compliance with those standards . . . ." (*Id.* at 20 n.13.) Thus, the court concluded that "Plaintiff [failed to] establish[] the admissibility of Dr. Durig's testimony by a preponderance of proof." (*Id.* at 22 (citations omitted).) Accordingly, for those reasons, the court granted Defendants' Motion to Strike Bryan Durig (ECF No. 43) and excluded the entirety of his testimony from trial. (*Id.* at 22.)

Plaintiff filed her Motion to Reconsider on February 18, 2019, arguing that the court committed several errors of law that are manifestly unjust. (ECF No. 120.) Plaintiff concludes that the court's Order and Opinion is "based in error, warranting reconsideration and amendment of the Order pursuant to Federal Rule of Civil Procedure 54(b)." (*Id.* at 8.) Defendants replied in opposition to Plaintiff's Motion on March 4, 2019, maintaining that "the fact that Plaintiff is not satisfied with [the] Order does not constitute sufficient grounds for reconsideration," and "[Dr.] Durig made his estimation solely on . . . guesswork, [which] does [not] absolve Plaintiff of her

3

burden to prove that Dr. Durig's methodology is reliable." (ECF No. 125.) Because this matter has been extensively briefed and argued, it is now ripe for the court's review. *See generally Sauls v. Wyeth Pharm., Inc.*, 846 F. Supp. 2d 499, 501 (D.S.C. 2012) ("The parties have fully briefed the issues, and this matter is ripe for consideration.").

## II. LEGAL STANDARD

### A. Motions for Reconsideration Under Rule 54(b)

The Federal Rules of Civil Procedure provide the following:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b) (emphasis added). A federal district court "retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops or arguments come to light." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (alterations in original) (citations omitted).

Despite the inherent flexibility embodied within Rule 54(b), the United States Court of Appeals for the Fourth Circuit has cautioned that "the discretion afforded by Rule 54(b) 'is not limitless,' . . . ." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *Carlson*, 856 F.3d 320 at 325). Specifically, a court's revision pursuant to Rule 54(b) is "cabined . . . by treating interlocutory rulings as law of the case." *Carlson*, 856 F.3d at

4

325 (citations omitted). Rule 54(b) provides a federal district court with discretion to revisit an earlier ruling, however, "such discretion is 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *U.S. Tobacco Coop. Inc.*, 899 F.3d at 257 (quoting *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). Accordingly, "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: '(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice.'" *Id.* (quoting *Carlson*, 856 F.3d at 325). While this standard resembles the standard under Rule 59(e), it accounts for "potentially different evidence discovered during litigation as opposed to the discovery of 'new evidence not available at trial.'" *Carlson*, 856 F.3d at 325 (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

**B. <u>Admissibility of Expert Opinions and Testimony</u>**

> The Federal Rules of Evidence provide:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) *the testimony is the product of reliable principles and methods*; and (d) *the expert has reliably applied the principles and methods to the facts of the case*.

FED. R. EVID. 702 (emphasis added). A federal trial court is tasked with ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). When evaluating the admissibility of expert testimony, "[c]ourts are required to act as 'gatekeepers' to ensure that expert testimony is relevant and reliable." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (quoting *Cooper*

*v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)). In order to fulfill its gatekeeping responsibilities, a federal court "must decide whether the expert has 'sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case.'" *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)). In other words, a court is tasked with conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–94. A federal district court may not abandon its gatekeeping function. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017).

Generally, a federal district court possesses "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. As the gatekeeper of expert testimony, federal courts may, but need not, consider the following factors:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592–94). The aforementioned factors are neither definitive nor exhaustive. *Kumho Tire Co.*, 526 U.S. at 150. The proponent of the expert testimony "must establish its admissibility by a preponderance of proof." *Cooper*, 259 F.3d at 199 (quoting *Daubert*, 509 U.S. at 592 n.10).

To ensure that an expert's testimony satisfies the *Daubert* standard, "courts may not evaluate the expert witness' conclusion itself, but only the opinions underlying methodology." *Bresler*, 885 F.3d at 195 (citing *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003)).

6

"Moreover, 'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'" *Id.* (quoting *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir. 2008)). Rejecting expert testimony is not the rule, but is rather the exception. *See In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013)).

### III. DISCUSSION

Plaintiff only argues that the court's Order and Opinion "is based in error, warranting reconsideration and amendment . . . pursuant to Federal Rule of Civil Procedure 54(b)." (ECF No. 120 at 8.) More specifically, Plaintiff contends that the exclusion of Dr. Durig would cause "manifest injustice." (*Id.*) Thus, the court is only tasked with determining whether its Order and Opinion committed a "clear error causing manifest injustice." *U.S. Tobacco Coop. Inc.*, 899 F.3d at 257 (quoting *Carlson*, 856 at 325).

In support of her argument, Plaintiff alleges that the court's Order and Opinion commits the following errors of law: (1) impermissibly relies upon photogrammetry; (2) mischaracterizes the foundation and substance of Dr. Durig's opinions; (3) misinterprets the IPMC and ASTM to require specific measurements, and Dr. Durig should be permitted to testify as to some of the applicable industry codes that do not require measurements; and (4) unjustly excludes Dr. Durig because Defendants failed to collect and preserve crucial evidence. (ECF No. 120 at 9–20.) The court will examine each of Plaintiff's contentions in turn, however, the court must first address the submission of Dr. Durig's supplemental affidavit.

### A. <u>Dr. Durig's Supplemental Affidavit</u>

Within her Motion to Reconsider, Plaintiff includes and relies upon an affidavit from Dr.

7

Durig that seems to supplement aspects of his report. (ECF No. 120-1.) Defendants specifically take issue with Dr. Durig's supplemental affidavit. (ECF No. 125 at 5.)

In *Snoznik v. Jeld-Wen, Inc.*, a plaintiff submitted a supplemental affidavit from Dr. Durig after the expert discovery deadline because it was "an effort to bolster [his] opinions so that he may withstand [a] [d]efendant's *Daubert* challenge." C/A No. 1:09cv42, 2010 WL 1924483, at *8–10 (W.D.N.C. May 12, 2010). The *Snoznik* court found that Dr. Durig's affidavit was not a timely supplementation and imposed a sanction against the plaintiff by striking Dr. Durig's supplemental affidavit from the case and refused to consider it in its analysis of his testimony. 2010 WL 1924483, at *9–10. Further, the court excluded Dr. Durig's testimony because his testimony was unreliable when he "took such measurements only occasionally and in any event did not record them." *Snoznik*, 2010 WL 1924483, at *12.

The Federal Rules of Civil Procedure specifically provide that "[a]ny additions or changes to [an expert's report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." FED. R. CIV. P. 26(e)(2). In the present action, all pretrial disclosures were due no later than August 31, 2018. (ECF No. 54 at 1.) Dr. Durig's supplemental affidavit was notarized on January 31, 2019, which is well after the pretrial disclosure deadline for the parties and, ironically, after this court's Order and Opinion excluding his testimony, on January 4, 2019 (ECF No. 96). For these reasons, Dr. Durig's supplemental affidavit is blatantly untimely. *See Snoznik*, 2010 WL 1924483, at *8–10. This late submission is inappropriate, and following the *Snoznik* court's lead, the court declines to consider Dr. Durig's late submission and will only consider his report that was originally and timely submitted. 2010 WL 1924483, at *9–10.

B. **The Alleged Reliability on Photogrammetry**

Plaintiff alleges that the court's Order and Opinion "places undue and factually

unsupported emphasis on the reliability of photogrammetry . . . ." (ECF No. 120 at 8.) Plaintiff emphasizes that "photogrammetry is not a reliable methodology as applied to the instant case," and the Order and Opinion "mistakenly ascribed" the testimony of Defendant's expert, Brian Boggess, to Dr. Durig. (*Id.* at 8–10.)

As an initial matter, the court recognizes that Dr. Durig did not expressly "admit" to declining the use of photogrammetry software, and Boggess' testimony was mistakenly attributed to Dr. Durig. (*See* ECF No. 96 at 18 (citing ECF No. 43-3 at 1–2).) Notwithstanding the oversight, the underlying proposition is not disputed by Plaintiff, which is that Dr. Durig made no attempt, by any means other than his perception, to provide an estimate or measurement of the dimensions of the water valve's depth, slope, or width. (*See* ECF No. 43-2 at 2–3; ECF No. 120 at 9–10.) Dr. Durig admits that he is not "aware of" any measurements regarding the water valve's area. (ECF No. 43-2 at 2–3.) Additionally, Dr. Durig seems to imply that he possesses software that may provide "ballpark estimates" of the disputed area. (*See id.* at 3.) While the court recognizes that photogrammetry may not provide *exact measurements* as emphasized by the experts from Plaintiff and Defendants (ECF No. 43-2 at 3; ECF No. 43-3 at 1–2), the court's Order and Opinion does not "place[] undue and factually unsupported emphasis on the reliability of photogrammetry." (ECF No. 120 at 8.) Nothing within the Order and Opinion states that photogrammetry is *necessarily required* by any expert. (*See* ECF No. 96.) It is mentioned to show that it *could have been a means* for Dr. Durig to provide measurements, other than his visual observations, to determine compliance with industry standards, including the ASTM. *See infra* Part III.C. Accordingly, as the issue of photogrammetry must be considered holistically and in the context of industry standards, Plaintiff's narrow interpretation of the court's Order and Opinion is, at best, misplaced, and fails to warrant reconsideration of Dr. Durig's exclusion on this basis.

## C. The Mischaracterization of the Foundation and Substance of Dr. Durig's Opinions

Plaintiff maintains that the court's Order and Opinion "omits reference to the facts and data at the foundation of [Dr.] Durig's testimony," and "the record demonstrates that Dr. Durig formed his opinions based on his review of a considerable amount of evidence, and not solely upon the estimated measurements supplied during his deposition." (ECF No. 120 at 12, 14.) Plaintiff further suggests that "the only expert opinion considered" in the court's Order and Opinion is "testimony by [Dr.] Durig estimating the depression to be approximately one to one and a half inches deep— a measurement supplied in response to an inquiry posed by opposing counsel at his deposition." (*Id.*) Lastly, arguing that Dr. Durig's testimony is the product of reliable principles and methods, Plaintiff argues that Dr. Durig did not "rely upon specific measurements as to the depth or slope of the subjective depression," which is not "required to support his opinions that Defendants violated applicable standards contained in the IPMC or [ASTM]." (*Id.* at 15.)

Plaintiff's argument misses the mark of the court's Order and Opinion and seeks to have this court challenge settled precedent from the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit. First, as is relevant here, in *Nease*, the Fourth Circuit reiterated that *Daubert* is a "flexible test and no single factor, even testing, is dispositive," but *Daubert* specifically applies to the testimony of mechanical engineers. *See Nease*, 848 F.3d at 230–32. (*See also* ECF No. 96 at 19–20.) Additionally, though a products liability case, *Nease* also held that an expert's hypothesis was *improperly admitted* when that expert "failed to validate it with testing," "conducted no tests," and "used no 'methodology' for reaching his opinions *other than merely observing dirt* on the speed control assembly components." *Id.* at 232 (emphasis added). Because of the expert's lack of attention to his craft, the Fourth Circuit noted that it could not "assess the potential rate of error of [the expert's] methodology [as] he did not employ a

10

particular methodology to reach his conclusions." *Id.* at 232. Moreover, the Fourth Circuit noted that the plaintiff's expert did not establish that his theory was "widely accepted in the relevant engineering community." *Id.* Due to these deficiencies in the expert's testimony, the Fourth Circuit found that a district court "abused its discretion . . . 'by failing to act as a gatekeeper.'" *Id.* at 231 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005); *Kumho Tire Co.*, 526 U.S. at 158–59).

This case squarely falls within the purview of *Nease*, which is directly cited within the court's Order and Opinion (ECF No. 96) and conveniently omitted within Plaintiff's Motion (ECF No. 120). Applying *Nease*, Plaintiff fails to show that Dr. Durig used a methodology, one beyond "merely observing" the water valve and its depression, in his assessment of the applicable industry standards. 848 F.3d at 232. (*See also* ECF No. 96 at 20.) *By his own account*, those standards require measurements. *See infra* Part III.C. Additionally, Plaintiff has provided no evidence suggesting that Dr. Durig's method of determining violations of the IPMC and ASTM are "widely accepted in the relevant engineering community." *Nease*, 848 F.3d at 231. (*See also* ECF No. 96 at 20.) Similar to the Fourth Circuit's excluded expert in *Nease*, the court has no way of assessing the potential rate of error of Dr. Durig's methodology, and Plaintiff has not even suggested such a method to the court (ECF No. 55, 120). *Nease*, 848 F.3d at 231. Moreover, directly analogous to the excluded expert in *Nease*, there is no indication, nor is there anything argued by Plaintiff, that Dr. Durig has conducted any physical test whatsoever of the area where Plaintiff's accident occurred (ECF Nos. 55, 120). *Id.* Put simply, while the court has no opinion on what Dr. Durig should have done within this case—whether that be the use of photogrammetry or something else—Plaintiff has not carried her burden by showing that Dr. Durig's testimony adheres to either *Daubert* or *Nease* and is sufficiently reliable for the application of the industry codes. (*See* ECF

No. 120.) Thus, Plaintiff has shown no clear error causing manifest injustice within the court's Order and Opinion as it relates to her *own failure to carry her burden* by a preponderance of proof. *Cooper*, 259 F.3d at 199.

Secondly, Plaintiff's insistence that this court undermine the Supreme Court is unpersuasive. In *Kumho Tire Co.*, the Supreme Court affirmed a district court's exclusion of an expert when that expert only conducted *a two-part test and a visual inspection*. 526 U.S. at 157. (*See also* ECF No. 96 at 19.) The Supreme Court specifically found that there was "no indication in the record that other experts in the industry use[d]" the expert's test, and neither were there any "articles or papers" validating the expert's approach. *Kumho Tire Co.*, 526 U.S. at 157. Here, Dr. Durig has not conducted any test, but only visually observed the water valve and depression through a photograph. (*See* ECF No. 55-2 at 2; ECF No. 55-3 at 17–19.) Because Dr. Durig has not conducted any physical test, his methodology is even more problematic than what the Supreme Court confronted in *Kumho Tire Co.*, where the testimony of an excluded engineer at least included a visual inspection *coupled with* a test. 526 U.S. at 157. Moreover, Plaintiff has not provided the court with any "articles or papers" validating Dr. Durig's approach in this case, which was important in *Kumho Tire Co.* (*See* ECF Nos. 55, 120.) *Taken together* with the industry standard's required measurements for compliance, *infra* Part III.C, Dr. Durig's opinion is unreliable, and Plaintiff has still failed to show that the court committed a manifest legal error when it found that *she failed to carry her necessary burden under Daubert*. Indeed, Plaintiff does not even suggest, *at any point within her Motion*, that she carried her required burden under *Nease* or *Daubert*. (*See* ECF No. 120.) Further, Plaintiff specifically fails to grapple with the Supreme Court's opinion and reasoning, upon which the court's Order and Opinion relies, in *Kumho Tire Co.* (*See id.*) Accordingly, Plaintiff has failed to show any clear error causing manifest injustice in the court's

12

Order and Opinion.

Within his report, Dr. Durig considered the following materials in order to form his opinion: (1) Plaintiff's Complaint; (2) discovery materials; (3) photographs of the parking lot; (4) Google Maps and StreetViews; (4) the IPMC; (5) the ASTM; and (6) observations of the parking lot.[1] (ECF No. 55-2 at 3.) These materials, alone, do not allow Dr. Durig to determine compliance with the industry standards to which he cites. *See supra* Part III.C. There is no indication that any of the aforementioned materials provided Dr. Durig with the measurements that he needed to determine compliance with the industry standards. (*See* ECF Nos. 55-2, 55-3, 55-5, 55-6.) As admitted by Dr. Durig in his deposition, he has no plans to perform any sort of physical testing and has not performed any. (ECF No. 55-3 at 11–12.) Moreover, Plaintiff has not shown that review *of these specific materials* are "widely accepted in the relevant engineering community" to determine compliance with the ASTM and IMPC. *Nease*, 848 F.3d at 231. Plaintiff is correct to note that the court's Order and Opinion views the foundation of Dr. Durig's opinion as lacking, which is partly indicative of her failure to carry her burden. (*See* ECF No. 96 at 20–22.) For these reasons, Plaintiff still fails to show that the court's Order and Opinion committed a clear error causing manifest injustice.

D. **The Interpretation of Industry Standards and Dr. Durig's Testimony**

Plaintiff maintains that the court's Order and Opinion erred because it improperly concludes that "compliance with [industry] standards is not solely dependent upon explicit measurements, and Dr. Durig was able to reliably reach opinions as to compliance without

---

[1] Within her Motion, Plaintiff cites to specific deposition testimony that Dr. Durig allegedly considered in forming his opinion. (ECF No. 120 at 12.) Problematically, these sources of information are not directly cited within Dr. Durig's original report (ECF No. 55-2), and the court has determined that it will not consider Dr. Durig's supplemental affidavit. *See supra* Part III.A.

knowing the precise depth of the depression." (ECF No. 120 at 16.) Plaintiff further suggests that Dr. Durig's opinions "are not dependent upon any hypothesis or theory necessitating validation through tests or measurements." (*Id.* at 19.) Noticeably, Plaintiff truncates quotes from the ASTM. (*Compare id.* at 16–17, with ECF No. 55-5 at 1–2.) Essentially, Plaintiff strongly believes that the court erred in excluding Dr. Durig's testimony because "neither [his] methodology nor the IPMC or ASTM require testing or explicit measurements [and] he relies on considerable knowledge and data to form his opinions." (ECF No. 120 at 20.) Lastly, Plaintiff takes the opportunity to differentiate case law relied upon in the court's Order and Opinion. (*Id.* at 18–19.)

The court's Order and Opinion explicitly stated that "compliance with the [IPMC] and [ASTM] is dependent upon explicit measurements. As such, given that Dr. Durig has failed to conduct any measurements, it is impossible for him to reliably determine whether Defendants were in compliance with those industry standards, and he cannot provide an opinion on this basis, regardless of whether those are the correct standards under which to evaluate the acts or omissions of Defendants." (ECF No. 96 at 21–22 n.13.) Notwithstanding Plaintiff's selective quotations of the ASTM standards, most of which are not even cited by Dr. Durig's original report, section 5.7.1, which is directly cited by Dr. Durig (ECF No. 55-2 at 5), states that "[e]xterior walkway shall be maintained so as to provide safe walking conditions." (ECF No. 55-5 at 2.) Section 5.1.1 states that "[w]alkways shall be stable, planar, flush, and even to the extent possible. *Where walkways cannot be made flush and even, they shall conform to the requirements of 5.2 and 5.3*." (*Id.* at 1 (emphasis added).) Under section 5.7, although an exterior walkway "may be considered substandard and in need of repair [if] the pavement is broken, depressed, raised, undermined, slippery, uneven, or cracked," "[v]ertical displacements in exterior walkways shall be transitioned in accordance with 5.2." (*Id.* at 2.) Section 6.1 states that "[w]alking surface hardware within

14

foreseeable pedestrian paths shall be maintained flush with the surrounding surfaces; *variances between levels shall be transitioned in accordance with 5.2.*" (*Id.* (emphasis added).) When there is a variance, section 5.2.1 specifically requires that "[a]djoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable." (*Id.* at 1.) Section 5.2.2 provides that "[c]hanges in levels up to ¼ in. (6 mm) may be vertical and without edge treatment," while section 5.2.3 permits "[c]hanges in levels between ¼ and ½ in. (6 and 12 mm) [to] be beveled with a slope no greater than 1:2 (rise:run)." (*Id.*) Lastly, section 5.24 also requires "[c]hanges in levels greater than ½ in. (12 mm) [to] be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these." (*Id.*) The IPMC only provides that "[a]ll sidewalks, walkways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions." (ECF No. 55-6 at 1.)

Upon taking a second review of Dr. Durig's expert report, he was prepared to testify as follows: (1) "[t]he sloped asphalt and *the change in elevation* in the area of the water valve cover is considered a hazardous area and *would be in violation of the requirements of ASTM F1637*"; (2) "[t]he sloped asphalt and *the change in elevation* in the area of the water valve *is in violation of the requirements of the IPMC*"; and (3) "it is concluded, to a reasonable degree of engineering certainty, *the sloped asphalt and the change in elevation in the area of the subject water valve cover is considered a fall hazard and is not being maintained in compliance with codes and industry standards.*" (ECF No. 55-2 at 5 (emphasis added).) Dr. Durig's expert report explicitly cites to sections 5.7.1, 6.1, and, by reference, 5.2 of the ASTM. (*Id.*) Dr. Durig only cites to section 302.2 of the IPMC within his report. (*Id.*) Within his deposition, Dr. Durig specifically stated that he relies upon the provisions of section 5.2 to formulate his opinions and seems to apply its

15

provisions without making any attempt to derive affirmative measurements or engage any physical testing whatsoever. (*See* ECF No. 55-3 at 11–12, 19–20.) As noted above, section 5.2 directly requires explicit measurements. (*See* ECF No. 55-5 at 1.) Sections 5.1, 5.7, and 6.1 directly incorporate section 5.2 in order to show compliance with the ASTM. (*See id.* at 1–2.) Moreover, Dr. Durig opined, at least as it relates to the IPMC, that to determine whether an area is "hazardous" depends upon what "*the codes require and what the industry requires*, and *you determine that you don't meet it*, then it becomes a hazard." (*Id.* at 23–24 (emphasis added).) Earlier in his deposition, he affirmatively references the measurements, none of which he performed, that he uses to determine compliance with the ASTM and possibly with the IPMC. (*See* ECF No. 55-3 at 19–21.) It seems that Dr. Durig may utilize the ASTM for purposes of determining whether something is "hazardous" under the IPMC. (*See id.*) Indeed, when referencing "codes," Dr. Durig affirmatively stated that he did not speak with any code officers, and there is no indication within his Report that he considered any type of local codes and/or ordinances. (*See* ECF No. 55-3.) Contrary to Plaintiff's selective view of the industry standards, as she literally truncates the language of the standards themselves, the standards require measurements as it relates to their compliance when deciphering a change in elevation, which are contained within section 5.2 and referenced by the other sections, measurements that Dr. Durig admittedly failed to undertake. (*See* ECF No. 55-3.)

Even though the court cited to product liability cases, those cases demonstrate the precise issues with the inherent reliability of Dr. Durig's expert testimony. In the cases cited by the court's Order and Opinion, the excluded experts failed to adhere to *Daubert* because they essentially conducted no measurements or tests and failed to validate their expert opinions. (ECF No. 96 at 21–22 (citing *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357–60 (2d Cir. 2004); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *Meemic Ins. Co. v. Hewlett-*

*Packard Co.*, 717 F. Supp. 2d 752, 764–66 (E.D. Mich. 2010); *Lokai v. Mac Tools, Inc.*, No. 2:05-cv-00925, 2007 WL 2248166, at *2 (S.D. Ohio 2007)).) Here, too, other than citing to his background and experience, Plaintiff does not cite to anything which truly validates or shows the inherent reliability of Dr. Durig's methodology or opinions as it relates to the applicable industry codes. (*See* ECF Nos. 55, 120.) Plaintiff does not suggest that Dr. Durig did any kind of comparison, measurement, or physical test. (*See* ECF Nos. 55, 120.) Moreover, as explained above about the industry codes, Dr. Durig's examination of Plaintiff's Complaint and reports about the parking lot do not aid his testimony as it relates to industry compliance because they are only about the alleged accident and history of the parking lot and contain no measurements. (*See* ECF Nos. 1, 55-3.) Lastly, although concerning different facts and circumstances, Dr. Durig has been excluded by other federal courts for his unreliability, which Plaintiff noticeably disregards when attempting to explain how his lack of any physical tests or measurements is reliable for a jury. *See Green v. Bradley Co.*, C/A No. 3:15-cv-02581-JMC, 2017 WL 4012298, at *5–7 (D.S.C. Sept. 12, 2017) (excluding Dr. Durig because his testimony was insufficiently reliable when the court could not determine or "much less analyze what principles and/or methodology [Dr.] Durig used"); *Snoznik*, 2010 WL 1924483, at *13 ("[I]n the present case, Dr. Durig's failure to document his testing adequately makes it extremely difficult for the [c]ourt to determine whether his work is reliable. Without adequate documentation . . . Dr. Durig's testing simply cannot be replicated by others in the scientific community."); *Morehouse v. Louisville Ladder*, C/A No. 3:03–887–22, 2004 WL 2431796, at *4–8 (D.S.C. June 28, 2004) (excluding Dr. Durig when he did not "employ[] sound scientific or engineering methodologies to test his spontaneous buckling theory," failed "to record his hypothesis testing or include relevant details in his report," there was "noticeable absence of support for Dr. Durig's theory," and no "measure[ments] of his testing

<mark>17</mark>

activity"). *Cf. Gaddy v. Blitz U.S.A., Inc.*, C/A No. 2:09–CV–52–DF, 2011 WL 13193319, at *3–4 (E.D. Tex. Jan. 18, 2011) (admitting Dr. Durig when he noted that another expert "conducted the relevant testing"); *Prothro v. Wal-Mart Stores, Inc.*, C/A No. 6:04–868, 2006 WL 5086578, at *1–2 (W.D. La. Jan. 27, 2006) (admitting Dr. Durig's testimony when he performed "measurements . . . as indicated in the bicycle's owner's manual"). For these reasons, Plaintiff fails to show that the court committed a clear error causing manifest injustice as it relates to its interpretation of the industry codes and Dr. Durig's reliance upon them when formulating his expert opinion.

### E. **The Unjust Exclusion of Dr. Durig**

Plaintiff vigorously asserts that the failure of Dr. Durig to obtain any measurements of the depression surrounding the valve cover is "the direct consequence of Defendants' decision to repair and alter the area without first photographing or measuring the area of concern, or notifying Plaintiff of their intent to repave." (ECF No. 120 at 20.) Plaintiff submits that Defendants "ultimately receive a windfall for their own malfeasance" if the court excludes Dr. Durig from testifying at trial, thereby setting a precedent that "incentivizes spoliation." (*Id.* at 22.) Plaintiff takes issue that the court's Order and Opinion "makes no reference to the issue of spoliation in its criticism of Dr. Durig's opinions in this case."[2] (*Id.* at 20.)

---

[2] Plaintiff is misguided, at best. Within its Order and Opinion, the court stated the following as it related to a different spoliation matter regarding *Plaintiff's damages expert, Dr. Brabham, who destroyed his notes*:

> As the parties did not fully brief the matter, the court declines to take the opportunity to determine whether Plaintiff violated Rule 26 of the Federal Rules of Civil Procedure and the appropriate sanction in the event of a violation. (*See* ECF Nos. 42, 58.) As previously noted, the parties agreed, during the hearing, that the court should consider any spoliation issues in the future and limit its review to the potential exclusion of this expert.

Plaintiff cites to industry standards, which require parties to "capture and preserve evidence in an expeditious manner."[3] (*Id.* at 20 (citing ECF No. 120-7 at 1).) Plaintiff insists that Defendants' violation of industry standards deprived Dr. Durig of "the opportunity to conduct the measurements which the [c]ourt insists are necessary to render a reliable opinion regarding the condition of the subject property." (*Id.* at 21.)

As noted above, the admissibility of expert testimony requires the court to assess the qualifications of an expert and determine whether his or her expert testimony is reliable for a jury. *See supra* Part II. As the gatekeeper of expert testimony, federal courts may, but need not, consider the following factors:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592–94). The aforementioned factors are neither definitive nor exhaustive. *Kumho Tire Co.*, 526 U.S. at 150. There is no indication that any type of spoliation matters should be included within a federal court's consideration of admissible expert testimony under *Daubert*. Indeed, Plaintiff cites no cases for such a proposition. (*See* ECF No. 120 at 20–22.) Moreover, Plaintiff relies upon standards and an analysis from Dr. Durig that

---

(ECF No. 96 at 14 n.8.) Similar to when the court declined to engage in an unfavorable sanctions analysis against Plaintiff, there is no need for the court to discuss sanctions against Defendants because the parties did not brief the matter under Rule 26 of the Federal Rules of Civil Procedure, and the issue of sanctions is not relevant for purposes of determining Dr. Durig's admissibility as an expert under *Daubert*. (*See id.*) In other words, the court has limited its review to the admissibility of proposed expert testimony when evaluating both of Plaintiff's experts and has treated both parties similarly as it relates to any appropriate sanctions. (*See* ECF No. 96.)

[3] As these additional industry standards were cited in Dr. Durig's supplemental affidavit, the court need not consider them because his affidavit is untimely. *See* Part III.A.

this court declines to consider because it is well after the pre-trial disclosure deadlines in this case. *See supra* Part III.A. Therefore, Plaintiff has failed to show that the court's Order and Opinion committed a manifest legal error in this regard.

## IV. CONCLUSION

Put simply, pursuant to precedent from the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit, Plaintiff has failed to carry her burden for the admissibility of Dr. Durig's testimony. After careful consideration of the court's Order and Opinion (ECF No. 96), Plaintiff's Motion to Reconsider (ECF No. 120), Defendants' Response (ECF No. 125), and the parties' arguments at the hearing, the court **DENIES** Plaintiff's Motion to Reconsider (ECF No. 120).

**IT IS SO ORDERED.**

*/s/ J. Michelle Childs*
United States District Judge

March 26, 2019
Columbia, South Carolina